IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | CASE NO. 3:26-cr-00031 |
| v. | ) | |
| | ) | CHIEF JUDGE CAMPBELL |
| HELEN BOERMAN, O.D. | ) | |

**DEFENDANT HELEN BOERMAN'S SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD VARIANCE**

Defendant Helen Boerman, O.D., ("Dr. Boerman") respectfully requests that the Court impose a sentence of twelve months and one day imprisonment. This sentence would appropriately reflect Dr. Boerman's lack of risk to the public, the mitigating circumstances surrounding the offense, her lack of criminal history and low recidivism risk, her immense regret and personal accountability for her actions, and the importance of minimizing the impact her incarceration will have on her husband and young children as well as the local community she has served for decades.

## I. RELEVANT BACKGROUND

### A. Personal Background

Dr. Boerman is a devoted wife and mother, accomplished doctor, and steadfast pillar within her local community. The daughter of Egyptian immigrants to the United States, Dr. Boerman grew up in Los Angeles, California, learning from her parents at a young age the importance of family, education, and public service. Dr. Boerman has been actively involved in community service since she was a teenager volunteering at Brotman Medical Center in Culver City, California, which sparked her interest in pursuing a career as a doctor.

Dr. Boerman attended the University of California at San Diego for her undergraduate studies, majoring in Physiology and Neuroscience. She graduated from there with a Bachelor's of

Science in 1999, and then attended the State University of New York in New York City, graduating in 2003 with a Doctorate of Optometry and obtaining licensure as an optometrist that same year. Dr. Boerman thereafter began working for the Wang Vision Institute in Nashville, Tennessee, first as a resident and subsequently as an optometrist; in all, this was a decadelong stint, during which time she fulfilled the requirements necessary to become a Fellow of the American Academy of Optometry. In 2013, Dr. Boerman transitioned to work as an optometrist at Cool Springs & Donelson Eye Care and then in 2015, she took ownership of Brentwood Eye Care in Nashville, Tennessee, from a retiring doctor.

Dr. Boerman owned, operated, and practiced out of Brentwood Eye Care for over a decade, with the practice seeing thousands of active patients and employing 15 individuals. Brentwood Eye Care, through Dr. Boerman, was a leading referral center for advanced, recalcitrant ocular surface disease and dry eye disease, offering advanced treatment options. Dr. Boerman treated in excess of 250 patients with severe dry eye disease between 2021 and 2026. Dr. Boerman provided meaningful mentorship to her employees at Brentwood Eye Care and regularly went above and beyond in serving her patients. Indeed, her patients report feeling that they were treated with kindness, patience, and empathy at every turn, and many experienced life-changing results from the treatment Dr. Boerman provided.

In addition to building a flourishing career and optometry practice, Dr. Boerman is also a devoted wife to her husband Chris and mother to their three children, Ivy (age 17), Emery (age 15), and Wesley (age 7). Dr. Boerman met Chris in 2004 in Los Angeles, California, while Dr. Boerman was visiting her family and presenting at a medical conference, and they married one year later. Dr. Boerman and Chris are deeply involved in their children's lives and have built a

close-knit family in which their three children are presently thriving. Dr. Boerman and Chris jointly homeschool their three children, with the same emphasis on educational attainment that Dr. Boerman's own parents instilled in her. Dr. Boerman's daughters, Ivy and Emery, are exceptional credits to their parents' commitment to education—both are presently enrolled as juniors at Middle Tennessee State University, having graduated high school years ahead of schedule. Dr. Boerman's daughter Ivy intends to go to optometry school, like her mother, once she graduates from college. Emery plans to pursue a Master's degree to become a cybersecurity specialist upon graduation from college. Dr. Boerman's youngest child, Wesley, is presently homeschooled and very close with his mother. All three of Dr. Boerman's children continue to live at home with her and Chris.

Beyond her devotion to her family and her patients, Dr. Boerman, along with her family, are heavily involved in community service through their local church. Dr. Boerman and Chris provide support and guidance to other families in their community facing a variety of struggles, including addiction, marital trouble, financial difficulties, and medical issues. The Boermans regularly open up their home to others, whether as a venue for engagement parties, weddings, or baby showers for couples with limited means or as short-term housing for families in need. Dr. Boerman is also passionate about using her specialized skillset to help her local community, providing pro bono eye care to those in need, including individuals who do not have health insurance or have financial constraints.

**B. The Offense Conduct**

On February 25, 2026, Dr. Boerman was charged by Information with one count of making criminal false claims against the United States in violation of Title 18, United States Code, Section 287. Information, ECF No. [1]. On May 5, 2026, Dr. Boerman pled guilty to this charge. Boerman

Plea Agreement, ECF No. [23]. While Dr. Boerman unequivocally accepts full responsibility for the offense conduct set forth in her plea agreement and the Presentence Investigation Report ("PSR"), important context deriving from Dr. Boerman's concern for the safety and comfort of her patients is relevant to the narrative surrounding the offense conduct.

**1. Next-Day Billing**

Beginning at least as early as February 2021, during the height of the COVID-19 pandemic, Dr. Boerman encountered patients at her clinic who were extremely concerned about their risk of becoming infected with COVID-19 but required regular in-person treatment in relation to severe dry eye disease. These patients, many of whom were immunocompromised and/or elderly, did not want to attend frequent appointments at Brentwood Eye Care due to their higher likelihood of encountering other people in the process and the attendant risk of these encounters resulting in a life-threatening COVID-19 infection. Even so, these patients had bilateral dry eye disease, requiring them to undergo placement of amniotic membrane grafts (AMG) on each of their eyes on a frequent basis. At the time, Dr. Boerman understood that under the reimbursement rules relating to Medicare, Medicare only covered one unit of AMG per patient per date of service. Therefore, patients covered by Medicare and requiring AMG placement on both eyes had to attend appointments on different days in order to receive fully reimbursable bilateral AMG treatment.

In response to her patients' concerns about COVID-19 exposure, Dr. Boerman began the practice of permitting patients to attend single appointments at which she placed AMGs on both of the patient's eyes. To ensure her patients' treatment was fully covered by Medicare, Dr. Boerman submitted claims to Medicare and created, or directed her staff to create, accompanying records that portrayed that the AMG treatment occurred on two separate days rather than a single day. Dr.

Boerman carried on this practice throughout 2022, gradually tapering down the frequency until around May 2023 when she fully reverted to her prior practice of performing each individual AMG placement on separate days when patients required treatment on both eyes because the COVID-19 pandemic no longer posed such a significant risk to her elderly and immunocompromised patients.

### 2. Graft-Splitting

Dr. Boerman received feedback from some of her patients that the AMGs were causing them discomfort or were not remaining in place for patients with significant eye laxity due to the size of the graft. During the relevant time period (February 2021 through October 2024), AMGs were only available in 10, 12, or 15 mm sizes, although the smallest 10mm size was frequently unavailable. To alleviate patient discomfort, Dr. Boerman divided single grafts into multiple grafts to reduce the size of the graft, even though she was aware that the grafts were intended to be for single use on a single eye. Dr. Boerman submitted claims to Medicare seeking reimbursement for the grafts that she used when she treated patients with AMGs without accounting for the fact that she had not used one graft per eye but rather one graft across multiple eyes, resulting in excessive reimbursement. Dr. Boerman, however, made no attempt to conceal this fact in patient medical records, listing the same serial number for a single graft across multiple AMG procedures. In fact, Dr. Boerman communicated the negative patient feedback as to the large graft sizes to Dr. Rob Sambursky, the CEO of DefEye, Inc. (formerly Verséa Ophthalmics, Inc.), the manufacturer of the Biovance AMGs Dr. Boerman used at the time. And after the manufacturer began offering a 7mm graft, Dr. Boerman ceased the practice of splitting grafts.

### C. Dr. Boerman's Guilty Plea and Resulting PSR

Following the Government's investigation into Dr. Boerman and her practice, on February 25, 2026, Dr. Boerman was charged by information with one count of making criminal false claims against the United States under Title 18, United States Code, Section 287. Information, ECF No. [1]. She appeared for an initial appearance on March 26, 2026, and was released on her own recognizance with standard conditions of release. ECF No. [14]. She entered a guilty plea on May 5, 2026. Boerman Plea Agreement, ECF No. [23].

Consistent with Dr. Boerman's plea agreement, Dr. Boerman's PSR sets her Total Offense Level at 25 and her Criminal History Category at I, resulting in a recommended guideline imprisonment range of 57 to 71 months, which is capped at 60 months as a result of the statutory maximum sentence associated with charges under Title 18, United States Code, Section 287. Boerman PSR at ¶ 106. Pursuant to the plea agreement, the Government has agreed to recommend no more than 48 months' imprisonment. Boerman Plea Agreement, ECF No. [23] ¶ 14.

## II. LEGAL STANDARD

When imposing a sentence, the court "shall impose a sentence sufficient, but not greater than necessary," to comply with the following purposes:

> [T]o reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]

18 U.S.C. § 3553(a)(2).

When determining the sentence to be imposed, the court must consider the following seven factors:

1. "the nature and circumstances of the offense and the history and characteristics of the defendant";

2. "the need for the sentence imposed" in light of the purposes identified above under section 3553(a)(2);

3. "the kinds of sentences available;"

4. "the kinds of sentence and the sentencing range established for--the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines--issued by the Sentencing Commission [(the "Guidelines")] . . .";

5. "any pertinent policy statement--issued by the Sentencing Commission . . . .";

6. "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct"; and

7. "the need to provide restitution to any victims of the offense."

*See id.* § 3553(a)(1)-(7).

Practically, a district court must engage in the following steps when determining the sentence to be imposed: (i) calculate the applicable sentencing range imposed by the Guidelines, (ii) consider the arguments of the parties as to an appropriate sentence and the above-referenced section 3553(a) factors, and (iii) explain its rationale for the sentence imposed on the record. *Gall v. United States*, 552 U.S. 38, 49-50 (2007). The Guidelines are meant to be the "starting point" and "initial benchmark" to serve the purpose of securing "nationwide consistency." *Id.* at 49. However, the court "must make an individualized assessment based on the facts presented." *Id.* at 50. A court is not entitled to presume that the sentencing range imposed by the Guidelines is inherently reasonable as to the individual being sentenced. *Id.* To the extent the court determines that a sentence that falls outside the Guidelines range is appropriate, the court "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the

degree of the variance. *Id.* "[M]ajor departure[s] should be supported by a more significant justification than [] minor ones[s]." *Id.*

The court must "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Pepper v. United States*, 562 U.S. 476, 487 (2011) (quoting *Koon v. United States,* 518 U.S. 81, 113 (1996)). "[T]he punishment should fit the offender and not merely the crime." *Id.* at 487-88 (quoting *Williams v. People of State of N.Y.*, 337 U.S. 241, 247 (1949)).

## III. ARGUMENT

While Dr. Boerman acknowledges that she made grave mistakes in connection with the claims she submitted to Medicare for AMG services she performed through Brentwood Eye Care, Dr. Boerman respectfully posits that a sentence of twelve months and a day imprisonment is sufficient, but not greater than necessary, to serve the purposes under Section 3553(a)(2), and requests that the Court grant her motion for a downward variance. A sentence of this nature would appropriately account for Dr. Boerman's mitigating personal characteristics and the explanatory circumstances surrounding the conduct, the sentences defendants with similar records who have been found guilty of similar conduct have received, and Dr. Boerman's sincere regret and personal accountability for the conduct at issue.

### A. The Nature and Circumstances of Dr. Boerman's Offense Warrant a Below-Guidelines Sentence.

Dr. Boerman's offense, while regrettable, was primarily the result of Dr. Boerman's misguided attempt to address patient safety and comfort concerns, was non-violent, and resulted in no identified patient harm. The crime to which Dr. Boerman has pled guilty involved submitting false claims for reimbursement to Medicare relating to AMG procedures where Dr. Boerman

misrepresented the dates of service and billed for a greater volume of grafts than she used due to her graft-splitting practices. Dr. Boerman engaged in the false next-day billing practice in response to requests from elderly and/or immunocompromised patients that she perform AMG procedures across both of their eyes on single-day appointments, rather than on consecutive-day appointments, to limit their potential exposure to other individuals who may have been vectors for COVID-19 infection. Dr. Boerman similarly split grafts, using a single graft across multiple AMG procedures, in response to patient complaints of discomfort or issues with the graft not remaining in place—an issue that predominantly impacts elderly patients with looser skin surrounding their eyes. Dr. Boerman notably did not attempt to conceal her graft-splitting practices in patients' medical records, listing the correct serial number for grafts used even when split across both eyes of a patient.

Dr. Boerman poses no risk to the public. Dr. Boerman is not aware of, nor does the PSR identify, any patients who were harmed due to either her performance of AMG procedures in both eyes on the same day or Dr. Boerman's practice of splitting large grafts into smaller sizes. In fact, many of Dr. Boerman's patients are grateful for the life-changing services she provided to them and the accommodations she made for them during the COVID-19 pandemic. While the PSR highlights the accounts of certain patients who experienced temporary or non-existent benefits from Dr. Boerman's treatment—a possible outcome for most medical treatments—Dr. Boerman treated in excess of 250 patients with severe dry eye disease between 2021 and 2026, with many patients experiencing significant improvement as a result of their treatment. The limited patient accounts referenced in the PSR are not representative of the experiences and outcomes for Dr. Boerman's broader set of patients.

### B. Dr. Boerman's History and Characteristics Warrant a Below-Guidelines Sentence.

Dr. Boerman has no criminal history, is at a low risk for recidivism, and has otherwise been a devoted wife and mother and an upstanding member of her local community. Dr. Boerman has never been arrested or convicted on criminal charges. Boerman PSR at ¶¶ 72-77. Therefore, as a 49-year-old woman with post-graduate education and no prior criminal history who has pled guilty to fraud, Dr. Boerman is at an extremely low risk for recidivism. *See* U.S. Sentencing Commission, *Recidivism Among Federal Offenders: A Comprehensive Overview* 18, 20, 23-24 (March 2016), accessible at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2016/recidivism_overview.pdf (finding that defendants with no criminal history points were the least likely to be rearrested within eight years relative to offenders with greater levels of criminal history; fraud defendants were the least likely to be rearrested within eight years relative to offenders convicted of other offense types; rearrest rates decline substantially with the offenders' age; women are less likely to be rearrested than men within eight years; and college graduates were substantially less likely to be rearrested within eight years relative to offenders with lower education levels). Because of this, a below-guidelines sentence can still appropriately serve the purpose of deterring Dr. Boerman from reoffending in light of her personal history and characteristics.

Dr. Boerman is also an integral part of both her immediate family and her local community such that incarcerating her for an extended period of time will have significant negative consequences for those around her. Dr. Boerman is a mother to three minor children, two of whom are teenagers and the youngest of whom is only seven years old. Incarcerating Dr. Boerman for an extended period of time will deprive her youngest son Wesley of his mother's care and will require

Dr. Boerman's husband, Chris, to take sole responsibility for Wesley's homeschool education—a responsibility shared by both Dr. Boerman and Chris at present. Similarly, Dr. Boerman's two teenage daughters, Ivy and Emery, ages 17 and 15, respectively, are at a critical period for their social and emotional development as both approach independent adulthood and would significantly benefit from having their mother present in their lives at this juncture. Dr. Boerman has been a critical source of support to her children to date, and her children have thrived as a result. Limiting Dr. Boerman's carceral sentence will ensure that her children are not subjected to an extended period without this critical support from their mother.

Dr. Boerman's daughters will also be uniquely affected by their mother's absence as a result of their Familial Hypercholesterolemia diagnosis, which Dr. Boerman has been instrumental in carefully managing since their birth. Familial Hypercholesterolemia is a genetic disorder that causes severely high LDL cholesterol from birth, resulting in significantly elevated risks for early heart disease. Dr. Boerman's daughters require ongoing medication management, cardiology care, laboratory results monitoring, and regular diet and exercise guidance and oversight to ensure that their condition is appropriately managed. Dr. Boerman's extended incarceration would severely limit her ability to ensure that her daughters' conditions do not decline.

Additionally, as the primary earner in her household historically, Dr. Boerman's incarceration, paired with her likely loss of her optometry license and exclusion from Medicare and other payors, will cause substantial hardship for Dr. Boerman's family. A limited period of incarceration would permit Dr. Boerman to direct her high intelligence and hard-working nature towards a new career to alleviate the financial hardship her family now faces as a result of her actions.

Dr. Boerman is also a pillar in her local community, and an extended carceral sentence will impair her ability to continue serving community members in need. Dr. Boerman provides emotional support and guidance to families in her local community who are facing financial, health, or personal struggles and intends to continue to do this following her sentence.

### C. Dr. Boerman Has Accepted Responsibility for Her Actions.

Dr. Boerman pled guilty to the offense and consented to being charged by information, notably alleviating the Government's need to obtain an indictment and expend further resources to establish her guilt. She readily acknowledges her wrongdoing and feels immense regret for the impact her actions have had on Medicare and her patients' trust in her. Dr. Boerman similarly regrets the impact her actions have had on her family and local community and takes full accountability for being the source of those harms.

### D. A Below-Guidelines Sentence Would Avoid Unwarranted Sentence Disparities.

While the Guidelines "represent the best indication of national sentencing practices" for the purposes of avoiding unwarranted sentencing disparities in compliance with Subsection 3553(a)(6), *United States v. Houston*, 529 F.3d 743, 752 (6th Cir. 2008), courts are also entitled to incorporate supplemental sentencing statistics from the Sentencing Commission into their analysis, *see United States v. Stock*, 685 F.3d 621, 629-30 (6th Cir. 2012), and to consider other individual cases bearing on the sentences of comparable individuals in comparable circumstances, *see United States v. Blackie*, 548 F.3d 395, 400 (6th Cir. 2008). Here, various considerations regarding the sentences imposed on similarly situated individuals under comparable circumstances warrants the imposition of a below-guidelines sentence for Dr. Boerman.

### 1. Dr. Boerman's Guidelines Range Overstates the Seriousness of Her Offense Relative to Similarly Situated Offenders.

While Dr. Boerman's Guidelines range is appropriately calculated as a legal matter consistent with her plea agreement, the loss amount, as a proxy for the seriousness of the offense, overstates the seriousness of her conduct relative to similarly situated offenders. The purpose of the loss amount gradations under Subsection 2B 1.1(b) is to "ensure that, the more harm the conduct at issue threatens, the more severely it is punished." *United States v. Simpson*, 538 F.3d 459, 464 (6th Cir. 2008). "In essence, '[t]he Guidelines use loss as a proxy for the seriousness of the fraud.'" *Id.* (quoting *United States v. Austin*, 479 F.3d 363, 369 (5th Cir. 2007)).

As a starting point, Dr. Boerman's final offense level as calculated in connection with the Guidelines is 25, and her criminal history category is I, resulting in a Guidelines range of 57 to 71 months, which is capped at 60 months as a result of the statutory maximum sentence associated with charges under Title 18, United States Code, Section 287. Boerman PSR at ¶ 106.

Dr. Boerman's offense level is most significantly affected by the loss amount from her offense, which accounts for a twenty-point increase to her offense level, based on the intended loss amount of approximately $11,000,000 falling within the range of $9,500,000 to $25,000,000. *See* U.S.S.G. § 2B1.1(b)(1)(K); Boerman PSR at ¶ 60. Dr. Boerman's intended loss amount notably falls within the low end of this range, with the median loss amount under Subsection 2B1.1(b)(1)(K) amounting to $17,250,000—an amount more than 50% higher than Dr. Boerman's intended loss amount.

Even further, Dr. Boerman's intended loss amount of approximately $11,000,000 is substantially larger than the $6,970,583.50 actual loss Dr. Boerman caused to the Medicare programs through her offense, which, under the specific circumstances here, better reflects the

seriousness of the offense. While Dr. Boerman does not contest that the intended loss amount was appropriately used in calculating her offense level as a legal matter and as reflected in her plea agreement, the intended loss amount overstates the seriousness of Dr. Boerman's offense under Subsection 3553(a)(2) as to the amount of funds Dr. Boerman expected to receive and, in fact, did receive from the Medicare programs as a result of the offense. Dr. Boerman knew from experience that the amount she billed to Medicare would not be the amount she would actually receive in reimbursements for the Medicare claims. Therefore, a Guidelines range sentence that weighs the seriousness of her offense by using the proxy of the intended loss amount results in a sentence that is excessive relative to similarly situated offenders who also understood that they would be reimbursed for only a portion of the claims amounts submitted to Medicare. *United States v. Semrau*, No. 2:07-CR-10074-JPM, 2011 WL 9258, at *4 (W.D. Tenn. Jan. 3, 2011) (applying the actual loss amount for a defendant's Sentencing Guidelines calculation because "[t]he evidence adduced at trial showed that [the defendant] knew the amount he billed to Medicare would not be the amount he would be reimbursed for the claims"). If Dr. Boerman's Sentencing Guidelines calculation had reflected only the actual loss amount, Dr. Boerman would have been subject to a 46–57-month Guidelines range.[1]

**2. Granting Dr. Boerman a Downward Variance Would Be Consistent with Sentences Received by Similarly Situated Defendants.**

Granting Dr. Boerman a downward variance in light of the above-referenced mitigating considerations and circumstances would not be a diversion from the treatment of similarly situated

[1] This range notably aligns with the maximum sentence the Government has agreed to recommend (48 months' imprisonment) under Dr. Boerman's plea agreement. Boerman Plea Agreement, ECF No. [23] ¶ 14.

defendants but rather would be consistent with how courts nationally treat defendants with similar starting recommended Guidelines ranges. Drawing on data published by the Sentencing Commission for fiscal years 2021-2025, 51% of defendants whose primary guideline was §2B1.1 with an offense level of 25 and a Criminal History Category of I, received a downward departure or variance from the Guidelines range that was not the result of a §5K1.1 substantial assistance departure. U.S. Sentencing Commission, *Judiciary Sentencing Information (JSIN) Query: Primary Guideline §2B1.1, Offense Level of 25, and Criminal History Category of I* (accessed August 15, 2026), https://jsin.ussc.gov/. Only 21% of this same set of defendants received a within-range sentence. *Id.* Therefore, imposing a below-Guidelines sentence of twelve months and a day on Dr. Boerman would not be inconsistent with the need to avoid unwarranted sentence disparities among similarly situated defendants under the specific circumstances set out here.

**3. Relevant Cases Involving Similarly Situated Defendants Illustrate the Appropriateness of Imposing a Downward Variance.**

The circumstances supporting Dr. Boerman's request for a below-Guidelines sentence are consistent with those supporting below-Guidelines sentences imposed on similarly situated defendants. This Court has departed or varied downward to the degree requested by Dr. Boerman based on similar considerations under Section 3553(a) and has imposed sentences of or near twelve months and a day on defendants with similar or greater recommended Guidelines ranges than Dr. Boerman's range.

For example, in *United States v. Mora*, this Court sentenced the defendant to 3 months' imprisonment followed by 5 months of home detention in connection with a charge of preparing and causing to be filed with the Internal Revenue Service materially false federal tax returns in violation of 26 United States Code, Section 7206(2). *See* Judgment in a Criminal Case (ECF No.

20), No. 3:18-CR-00056 (M.D. Tenn. Aug. 7, 2018). Defendant Mora faced a recommended Guidelines range of 24 to 30 months but successfully argued for a downward variance in light of the defendant's lack of criminal history, low risk of recidivism, integral involvement in service to her local community, sole responsibility for her two young daughters, efforts to make restitution, and the applicable loss amount overstating the seriousness of her offense. *See generally* Mot. of Def. Ironelly Mora for a Mitigated Sentence and Departure, and Downward Variance Below the Sentencing Guidelines, With Incorporated Sentencing Mem. (ECF No. 16), *United States v. Mora,* No. 3:18-CR-00056 (M.D. Tenn. Jul. 26, 2018). While Dr. Boerman faces a greater recommended Guidelines range, her request for a below-Guidelines sentence of twelve months and a day imprisonment under highly similar Section 3553(a) considerations is roughly consistent with the approximate 66% reduction in incarceration from the low end of the Guidelines range that Defendant Mora received, treating her 5 months of home confinement as akin to supplemental incarceration.

This Court has permitted below-Guidelines sentences similar to what Dr. Boerman is requesting in cases with highly similar or greater Guidelines ranges under comparable offense scenarios and loss amount levels. For example, in *United States v. Carr*, this Court sentenced the defendant to a term of imprisonment for 24 months in connection with a charge of conspiring to defraud the Medicare program of over $9 million and violate the Anti-Kickback Statute in violation of 18 United States Code, Section 371, despite the defendant's PSR indicating that a term of imprisonment of 87 to 108 months was appropriate under the defendant's Guidelines range with a similar statutory maximum limitation of 60 months' incarceration. *See* Judgment in a Criminal Case (ECF No. 73), No. 3:23-CR-00021 (M.D. Tenn. Apr. 30, 2026); United States' Sentencing

Mem. (ECF No. 68) at 4-5, No. 3:23-CR-00021 (M.D. Tenn. Apr. 23, 2026). Similarly, in *United States v. Kestner*, this Court sentenced the defendant to 18 months' incarceration in connection with 13 counts of healthcare fraud or conspiracy to commit healthcare fraud in violation of 18 United States Code, Sections 1349 and 1347, despite the defendant's PSR indicating that a term of imprisonment of 188 to 235 months was appropriate under the defendant's Guidelines range. *See* Judgment in a Criminal Case (ECF No. 531), No. 3:19-cr-00095 (M.D. Tenn. May 27, 2025); Mem. in Support of the Government's Position on Sentencing and Analysis of 3553(a) Factors (ECF No. 479) at 1, No. 3:19-cr-00095 (M.D. Tenn. Apr. 14, 2025). In this case, the defendant was the CEO of the network of companies through which the fraud was committed and, through the companies, billed federal and state payors more than $37 million. Mem. in Support of the Government's Position on Sentencing and Analysis of 3553(a) Factors (ECF No. 479) at 2-5, No. 3:19-cr-00095 (M.D. Tenn. Apr. 14, 2025). The Court based its below-Guidelines sentence primarily on a policy disagreement with the degree to which loss amounts factor into the offense level as to Guidelines ranges and the defendant's old age and poor health status. Transcript of Proceedings (ECF No. 536) at 42:10-56:5., No. 3:19-cr-00095 (M.D. Tenn. May 14, 2025).

## IV. CONCLUSION

Taking into account the Section 3553(a) considerations specific to Dr. Boerman, including Dr. Boerman's lack of risk to the public, the unique motivating circumstances surrounding the offense, her lack of criminal history and low recidivism risk, her immense regret and personal accountability for her actions, and the significant impact her incarceration will have on her husband, young children, and local community, Dr. Boerman respectfully requests that the Court grant her motion for a downward variance and impose a sentence of twelve months and a day—a

sentence that is reasonable but not greater than necessary to achieve the purposes set out in Section 3553(a)(2).

Respectfully submitted,

*/s/ Oliver Benton Curtis, III*____
Oliver Benton Curtis, III (*pro hac vice)*
Leah Palmer (*pro hac vice)*
**McDermott Will & Schulte LLP**
333 SE 2nd Avenue, Suite 4500
Miami FL 33131
Telephone: (305) 358-3500
bcurtis@mcdermottlaw.com
lpalmer@mcdermottlaw.com

*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 4, 2026, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

*/s/ Oliver Benton Curtis, III*
Oliver Benton Curtis, III